Filed 9/11/20  D.T. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| D.T.,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF TULARE COUNTY,<br><br>        Respondent;<br><br>TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | F081328<br><br>(Super. Ct. Nos. JJV071833A, JJV071833B)<br><br><br>**OPINION** |

## THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  John P. Bianco, Judge.

Timothy W. Bragg for Petitioner.

No appearance for Respondent.

Deanne H. Peterson, County Counsel, and Carol Helding, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*        Before Poochigian, Acting P.J., Franson, J. and Meehan, J.

D.T. (mother) seeks an extraordinary writ from the juvenile court's orders issued at an 18-month review hearing (Welf. & Inst. Code, § 366.22)[1] in June 2020, terminating reunification services and setting a section 366.26 hearing on October 21, 2020, as to her now 13- and 12- year-old sons, X.H. and I.H., respectively. She contends the juvenile court erred in not returning them to her custody because there was insufficient evidence it would be detrimental to them. We conclude substantial evidence supports the court's detriment finding and deny the petition.

**PROCEDURAL AND FACTUAL SUMMARY**

In October 2018, after monitoring mother's family situation through the probate court for 18 months, the Tulare County Health and Human Services Agency (agency) took her four sons, then 11-year-old X.H., 10-year-old I.H., and six-year-old twins, V.H. and J.H., into protective custody and placed them in foster care. X.H. and I.H.'s father was in state prison for voluntary manslaughter. The twins' father was unable to take custody of them.

The agency's concerns stemmed mainly from mother's methamphetamine use and mental instability. At 31, she had been using methamphetamine on and off since the age of 15 or 16 and had frequent suicidal ideation and made numerous attempts to commit suicide. Her last attempt occurred in August 2017 when she tried to hang herself. She was diagnosed with severe depression with psychotic features, chronic posttraumatic stress disorder and methamphetamine abuse. In April 2018, the children were placed in a temporary legal guardianship with family friends. The agency intervened when the friends' petition for permanent guardianship was denied and the children were going to be returned to mother's custody.

The children had previously made their desires known with respect to returning to mother's custody. X.H. did not want to live with her because she used drugs. He found

---

[1] Statutory references are to the Welfare and Institutions Code.

2

" 'white rocks in a bag once' " and a " 'white pipe that [was not] for weed.' "  He broke the pipe in mother's face because he was angry.  I.H. wanted to live with mother if she stopped using drugs and had a house.  J.H. did not want to live with mother, stating she screamed at them and sometimes had no food for them.  V.H. was sad he could not see mother because she " 'does drugs and smokes in her room.' "

The juvenile court detained the children pursuant to an original dependency petition filed by the agency under section 300, subdivisions (b) and (g) and ordered substance abuse, mental health and parenting services for mother pending its disposition of the case.

The agency recommended the juvenile court order reunification services for mother only.  She was participating in substance abuse services and had just started taking psychotropic medications.  However, she was aggressive with agency staff when frustrated.

In January 2019, the juvenile court convened a contested jurisdictional/ dispositional hearing.  By that time, the children had been placed with their maternal great aunt, M.T., in Fresno.  The court adjudged the children dependents as alleged, ordered them removed from parental custody and adopted the agency's recommendations regarding family reunification services.  The court transferred the case to Fresno County where mother was residing.

By the six-month review hearing in July 2019, mother and the children were enjoying weekly unsupervised visits.  She completed a parenting program and was testing negative for controlled substances.  She was also participating in individual therapy.

At the six-month review hearing in July 2019, the Fresno County Juvenile Court continued reunification services and set the 12-month review hearing for December 2, 2019.  Meanwhile, the case was transferred back to Tulare County and the 12-month review hearing was set for November 25, 2019.

Mother complied with her services plan. She was in a recovery inpatient program with transitional housing and had rooms and beds for the children. The children were well adjusted to living with M.T. and doing well in school. X.H. and I.H. wanted to remain in her care and finish middle school in Fresno. X.H. wanted to remain in Fresno to attend high school.

The agency recommended the juvenile court grant mother another six months of reunification services and the agency discretion to return the children to her custody. The agency, however, wanted to monitor and assess the children's return to her custody by transitioning to overnight visitation.

In November 2019, at the 12-month review hearing, the juvenile court declined to grant the agency discretion to return the children to mother's custody because she missed six drug tests from July to September 2019, which the court considered positive. The court, however, granted the agency discretion to arrange unsupervised and overnight visitation. The court set an interim review hearing for February 24, 2020, and the 18-month review hearing for March 30, 2020.

Mother continued to reside in transitional living where she could remain until she obtained outside housing. Her program director said she was compliant with the program requirements and doing well. She attended weekly groups and program activities. She displayed maturity in decision making and solving problems and had learned not to give up easily and to press through conflict.

On February 24, 2020, the juvenile court admonished mother about her positive test results for marijuana, advising her that positive results were unacceptable. Minors' counsel advised the court that J.H. and V.H. wanted to return to mother's custody but X.H. and I.H. wanted to remain in Fresno indefinitely. They were doing well in school and participating in sports. The court confirmed the 18-month review hearing for March 30, 2020. The hearing was continued to June 1, 2020.

4

By April 2020, the agency was recommending the juvenile court return V.H. and J.H. to mother's custody under family maintenance services.  Mother was compliant with her services plan, including negative drug test results, and had been visiting the children overnight each week since November 2019.

On May 8, 2020, mother's attorney filed a modification petition under section 388 (section 388 petition) asking the juvenile court to return all four children to mother's custody under family maintenance.  The petition alleged mother was "performing superbly in her substance abuse program" and met every goal set for her.  Her mentors were exceedingly pleased with her progress.  The court set a hearing on mother's section 388 petition to be heard in conjunction with the 18-month review on June 1, 2020.

In its report for the 18-month review hearing, the agency recommended the juvenile court place V.H. and J.H. with mother with family maintenance services, terminate family reunification services for X.H. and I.H. and select a permanent plan for them of legal guardianship with M.T.

Mother continued to comply with her services plan.  Her goals were to work and obtain housing to provide a stable home for the children.  She had a parent partner who supported her and would continue to mentor her.  Overnight visits with her sons went well and V.H. and J.H. were ready to go home to her.  X.H. and I.H., however, were not ready.  Although they enjoyed visiting mother and spending the night with her, they were concerned about her ability to care for them long term.  They felt they finally had a home with M.T. and considered their uncle, Jimmy, a father figure.  They were tired of moving and wanted to enjoy the school they were attending.

On June 1, 2020, the juvenile court returned J.H. and V.H. to mother's custody under family maintenance services and set a contested hearing on June 8, 2020, to consider the agency's recommendations regarding the two older boys and mother's

section 388 petition. County counsel advised the court that April 2, 2020, marked the 18-month limitation on reunification services.

The issue at the contested 18-month review hearing on June 8, 2020, was whether it would be emotionally detrimental to then 13-year-old X.H. and 12-year-old I.H. to return them to mother's custody. The boys testified.

I.H. witnessed mother using drugs and other people bringing drugs into the home throughout his childhood. He did not go to school every day because mother did not have a car. Since living with M.T., he attended school every day and was making better grades. He also played softball, football and basketball and ran track and cross country. His uncle helped him with everything he needed. He felt "sort of" close to mother and believed she could keep him safe. However, he would feel "awful" if he was returned to her custody, explaining that he had been close to his aunt and uncle for over a year and his uncle was "like a father figure" to him. He was fine living separately from his younger brothers as long as he was able to visit them.

On cross-examination, I.H. said there was nothing that would make him change his mind about reunifying with mother. He felt safe at the transitional housing but mother told him there were people there that used drugs around her and that scared him. Seeing a lot of people around mother reminded him of when he lived with her and she was using drugs. He was afraid that mother might relapse and he would have to return to foster care.

X.H. testified it was "hard" living with mother. She used drugs and there were a lot of people in and out of the home. He did not pass second grade because mother did not have a car and he missed too much school. They moved approximately four times and he went to five or six different schools. At M.T.'s house he played outside with his brothers and had a father figure in his uncle Jimmy. Uncle Jimmy was important to him and he was concerned mother would not let him have a relationship with him if he was returned to her custody. He was in eighth grade, was making better grades, had a lot of

friends and played baseball and soccer.  It would "hurt" if the court ordered him to return to mother's custody because he viewed Jimmy and M.T. as parental figures.  He did "not really" feel safe going back to mother because she was going to move out of the transitional housing soon and he was concerned she would resume her old lifestyle.  He was willing to work on his relationship with mother and visit her but wanted to "calm it down a little," explaining that at the end of their visit the week before he got emotional while leaving his little brothers and mother yelled at him.  She said, " 'That's why my Public Defender is going to fight for you guys to come home.' "

Mother testified she had been clean for two years, since June 23, 2018.  Asked whether she would return to her prior drug use, she said she would not.  She wanted to move forward with her children.  She hoped to remain in transitional housing for another year if she was unable to secure governmental housing.  If she was unable to secure housing, she planned to take the children and relocate to Arizona where her twin sister and father lived to better her life.  However, she would only move to Arizona if she had all four boys in her custody.  She believed the transitional housing was safe.  She did not have contact with any of the people with whom she used drugs.  She believed her enforcement of rules influenced X.H.'s attitude about returning to her care.  He did not like to be told "no."  "He ha[d] it made" at M.T.'s house.  He played electronics and had a phone.  When he did not listen to mother, she took the things he liked from him.  She denied raising her voice the weekend before with X.H.  She was responding to I.H.'s statement that X.H. did not want to return to her because he did not trust her.  She stated, " 'Look, don't even talk about it.  It's not what the social worker says, it's what the judge says.  If the judge says you guys are coming home, you guys have to suck it up.' "  X.H. got mad and told her he was going to run away if he was returned to her custody.  No one ever offered her any counseling with X.H. and I.H.  She thought things would go well if the children were all returned to her because they were one as a family and it hurt when the brothers were separated.  She understood X.H. and I.H. felt strongly about staying

7

with M.T. and Jimmy but she wanted to be a mother to her children and wanted the agency to give her that responsibility. X.H. and I.H. asked to spend more time with her but M.T. was unable to pick the children up because she was working.

Following testimony, the juvenile court asked counsel to present their arguments in points and authorities and address whether the court could continue reunification services to the 24-month review hearing. The court continued the hearing to June 22, 2020.

On June 22, 2020, the juvenile court followed the agency's recommendations, terminated reunification services as to X.H. and I.H. and set a section 366.26 hearing for October 21, 2020. The court set a family maintenance review hearing as to V.H. and J.H. for December 2020. The court denied the section 388 petition, finding the request as to V.H. and J.H. was moot.

## DISCUSSION

Mother contends the juvenile court abused its discretion in not returning X.H. and I.H. to her custody. She seeks an order returning them with family maintenance services.

The juvenile court's decision not to return the children to mother's custody was based on its finding it would be detrimental to them. We review the court's detriment finding for substantial evidence. We conclude substantial evidence supports the court's detriment finding and deny the petition.

Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 308.) Section 366.22, subdivision (a) requires the juvenile court at the 18-month review hearing to return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being.

The agency has the burden of establishing detriment. (§ 366.22, subd. (a).) The reviewing court considers the entire record to determine whether there is substantial

8

evidence to support the juvenile court's conclusions. Due to the juvenile court's ability to observe the demeanor of the witnesses, the reviewing court reviews the record in a light "most favorable to the court's order and … indulge[s] every inference in favor of the court's decision so long as those inferences … ' "rest on the evidence" [citation]' not 'mere speculation or conjecture.' " (*In re R.M.* (2009) 175 Cal.App.4th 986, 988–989.)

Here, the uncontroverted evidence was that mother completed her case plan and maintained her sobriety for two years. There was no evidence X.H. and I.H. would be at risk of physical harm if returned to her custody. Instead, the question was whether they would suffer emotionally. The juvenile court concluded that they would, stating:

> "What the Court finds compelling is the testimony of the children in which they have described a rather difficult growing up period where they were in and out of mother's care. I think one of the children indicated that they actually probably spent more time with a relative than they did with mother throughout their life [and] [t]hat when mother had them, it was not stable. It was fraught with drugs and strangers and constant change."

Mother contends the juvenile court's detriment finding was based on X.H. and I.H.'s reticence about living with her in transitional housing. Such evidence is insufficient, she contends, to deny her custody, citing *In re Yvonne W.* (2008) 165 Cal.App.4th 1394 (*Yvonne W.*). Equally insufficient, she contends, was the boys' subjective fears that she might relapse. We find *Yvonne W.* distinguishable[2] and mother's contentions meritless.

*Yvonne W.* arose on appeal from the juvenile court's order made at an 18-month review hearing maintaining Yvonne's placement in foster care. The appellant mother, Celeste, challenged the court's detriment finding and the Court of Appeal reversed the order. (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1397.) At age 11, Yvonne became a juvenile court dependent because of Celeste's drug use. By the end of the six-month review period, Celeste was making good progress in her reunification plan, enjoying

---

[2] The juvenile court considered *Yvonne W.* and found it distinguishable.

9

weekend and overnight visits with Yvonne, and had given birth to a baby boy who remained in her custody. Yvonne was in a group home awaiting a foster care placement. (*Id*. at pp. 1397–1398.) Celeste's progress continued over the next six months but she struggled to find stable housing. Yvonne remained in her group home, but was having behavioral and emotional problems. She loved Celeste and felt emotionally connected to her but also felt "a great deal of rage toward her," however, she "wanted to live with her mother and baby brother." (*Id*. at p. 1398.) At the 12-month review hearing, the court found Celeste made substantive progress with her case plan but that returning Yvonne to her would create a substantial risk of detriment and ordered six more months of reunification services. (*Ibid*.)

In a report prepared for the 18-month review hearing, the social worker stated that Celeste had found " 'appropriate housing' " at a shelter, where she could stay for two years. Celeste was compliant with reunification services and was able to provide a safe environment for Yvonne and her six-month-old son. Yvonne was in a foster home, was doing well, and had attained emotional stability. She had unsupervised visits with Celeste at the shelter, where she had a bed and space for her personal belongings. However, Yvonne complained that she sometimes felt uncomfortable visiting Celeste at the shelter and often felt sick after visits. Celeste reported that Yvonne sometimes had a negative attitude toward people at the shelter and appeared to " 'look down' " on them. Yvonne expressed her fear of being homeless. She was addressing these and other concerns in therapy. (*Yvonne W*., *supra*, 165 Cal.App.4th at pp. 1398–1399.)

At the close of the contested 18-month review hearing, the juvenile court found, by a preponderance of the evidence, that returning Yvonne to Celeste's custody would create a substantial detriment to Yvonne's physical and emotional well-being because Yvonne was fearful, anxious and unhappy with Celeste's living arrangement. (*Yvonne W*., *supra*, 165 Cal.App.4th at p. 1399.)

The *Yvonne W.* court reversed the juvenile court's detriment finding because there was no evidence "conditions at the shelter pose[d] a risk of harm to Yvonne in any identifiable way." (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1401.) "Despite Yvonne's concerns about the shelter and the prospect of becoming homeless, she 'very much' want[ed] to reunify with Celeste" and there was "no specific and objective evidence to show that Yvonne would suffer detriment, including serious psychological or emotional injury, if she were placed with Celeste at the shelter." (*Id.* at p. 1402.) The court stated:

> "Celeste is successfully raising her young son in that environment and is able to provide for his safety, health and well-being. Yvonne was having unsupervised weekend visits at the shelter with no reported problems other than her dislike of the shelter and the residents. A child's dislike of a parent's living arrangement, without more, does not constitute a substantial risk of detriment within the meaning of section 366.22, subdivision (a). Proving substantial detriment cannot mean merely proving that a parent's living arrangement is less than ideal. [Citation.] Celeste's limited financial resources, which require her to live in a shelter until she can obtain alternative housing, is not a legitimate ground for finding detriment. [Citation.] 'We cannot separate parents and their children merely because they are poor.' [Citation.] [¶] … [¶ Nothing in the record indicates that Celeste is incapable of parenting Yvonne." (*Yvonne W.*, *supra*, 165 Cal.App.4th at pp. 1401–1402.)

*Yvonne W.* is distinguishable because the juvenile court in that case based its detriment finding on Yvonne's concern about Celeste's living arrangement. Here, although the court considered X.H. and I.H.'s fear about being exposed to drug users at the transitional facility, that was *not* the reason the court found detriment, as evidenced by its quoted statement *ante*. *Yvonne W.* is also distinguishable because there was no emotional consequence of placing Yvonne with Celeste. Yvonne wanted to live with Celeste but was not comfortable with her living environment. There was no evidence that removing her from her foster family would cause her emotional damage. Here, on the other hand, there was an emotional consequence of placing X.H. and I.H. with mother because it necessitated their removal from M.T. and Jimmy, where the boys had found

11

security and success. They were strongly attached to M.T. and Jimmy and viewed Jimmy as the father they did not have. Separating them from Jimmy, therefore, was akin to separating them from their father. They expressed the emotional damage that would result. X.H. said it would "hurt" if he had to leave M.T. and Jimmy and threatened to run away. I.H. said it would be "awful."

Further, the boys' fears that mother might relapse are well-founded fears. They understood on a deep level the instability that resulted from her drug use, having endured it for years. They also understood that her stay at the transitional housing was limited and that relapse was a possibility once outside the structure of its confines. That they should feel emotional distress at the prospect of being removed from a stable environment and placed in a tenuous one is fully understandable and supported by the evidence.

We conclude substantial evidence supports the juvenile court's finding that returning X.H. and I.H. to mother's custody would create a substantial risk of detriment to their emotional well-being and affirm its orders terminating her reunification services and setting a section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.